Angela JONES, Plaintiff,

v.

### DISTRICT OF COLUMBIA, et al., Defendants.

### No. CIV.A.00–2140(RCL).

United States District Court, District of Columbia.

Nov. 8, 2004.

withdrew his arbitration claim and mooted the petition. (*See* Respondent's Mot. at 10).

John F. Karl, Jr., William P. Farley, Nancy J. Malir, McDonald & Karl, Jonathan E. Halperin, Regan Halperin & Long, PLLC, Washington, DC, for Plaintiff.

William Burkett, Office of Corporation Counsel, D.C., Robert A. DeBerardinis, Jr., Corporation Counsel for D.C., Washington, DC, for Defendants.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter came before the Court on the defendants' Motion [48] for Summary Judgment. Upon consideration of the defendants' motion, the opposition thereto, the reply, the applicable law, and the entire record herein, the Court GRANTED the defendants' Motion [48] for Summary Judgment in an Order issued September 30, 2004. The Court's reasoning is set forth below.

### BACKGROUND

This is an action brought by a corrections officer against the District of Columbia, and the District of Columbia Department of Corrections in particular, alleging gender-based discrimination in violation of Title VII of the 1964 Civil Rights Act, as amended. Motions for summary judgment require the Court to review the facts and evidence in the light most favorable to the non-moving party—here the plaintiff. Therefore, the following statement of facts is taken directly from the plaintiff's complaint, her opposition to the defendants' motion for summary judgment, and the plaintiff's statements of record filed with the Court.

The plaintiff, Angela Jones, was hired as a corrections officer by the District of Columbia Department of Corrections in September 1997. Jones was aware that the D.C. Department of Corrections has a published sexual harassment policy. See Def.'s Mot. for Summ. J., Ex. L (District of Columbia Department of Corrections, Department Order, "Sexual Harassment of Employees"); Pl.'s Opp. at 18 (asserting plaintiff's awareness of this policy). After her initial training, which included sexual harassment training, Jones was placed at the D.C. Department of Corrections' Occoquan Facility in Lorton, Virginia, where she was initially assigned to work with Sergeant Daryl Ellison. It is unclear from the record whether Ellison was Jones' supervisor. Although Ellison claimed, at various times, to have the authority to assign overtime and write evaluations of Jones' job performance, and Jones believed these claims at the time they were made, Jones later learned that he did not have the authority to do either of these things. See Pl.'s Opp., Stmt of Material Facts, at 3 ¶ 10, 5 ¶ 20; Pl.'s Opp. Ex. A (Jones Dep.), at 50–51; Pl.'s Opp., Ex. B (Jones Decl.), at ¶ 3. In official terms, it appears that Ellison was not a supervisor at all but merely a more senior officer in the "zone" to which Jones was assigned. See Def.'s Mot. for Summ. J., Ex. H (Letter from Adrienne Poteat, D.C. Department of Corrections Deputy Director for Institutions, to Margaret Moore, Director, D.C. Department of Correction, June 22, 1998) ("[It] is my recommendation . . . that Sergeant Ellison receive training regarding interpersonal relationships and effective communication rather than supervisory training *since he is not a supervisor.*") (emphasis added).

During the first two weeks of Jones' employment at Lorton, Ellison told Jones and one officer Cole "that if they wanted overtime, they needed to give him their

telephone numbers." Pl.'s Opp. to Def.'s Mot. for Summ. J. at 5 ("Pl.'s Opp."). In addition, at times not specified, but presumably early in the period of Jones' employment at Lorton, Ellison commented on his "sexual prowess, stating 'I am the man.'" Pl.'s Opp. at 5. "On two or three occasions, [Ellison] told [Jones] that he had dreams of having sex with her," and each time would "ask [Jones] whether she was trying to make his 'dream come true.'" *Id.*

At other unspecified times, Ellison "made statements to Ms. Jones' co-workers that he was attracted to her and would like to have sex with her;" Pl.'s Opp., Stmt. of Material Facts, at 3 ¶ 14; made "remarks of a sexual nature to [Jones]," commented on "the size of [Jones'] breasts and the size of her bra," and asked "what color were [Jones'] bra and underwear and what 'print' there was on her underwear." Pl.'s Opp., Stmt. of Material Facts, at 5 ¶ 21. Additionally, Jones learned that, again at various unspecified times during Jones' employment at Lorton, Ellison had entered into a wager with other male corrections officers concerning which of them would "score with [Jones] first," Pl.'s Opp., Stmt. of Material Facts, at 3 ¶ 13, and that Ellison told several inmates that Jones was a homosexual "because she would not have sex with [Ellison]," *id.* at 5 ¶ 23. Ellison would "on occasion, rub his crotch when he was alone with Ms. Jones." *Id.* at 8 ¶ 34. When Jones rebuffed Ellison's advances, he threatened her with poor evaluations and disciplinary action. *Id.* at 5 ¶ 22 (referring to Pl.'s Opp., Ex. B (Jones Decl.), at ¶ 9).

Approximately three months after Jones' began working at Lorton, in December 1997, Ellison unlocked the door to the facility's gym so that Jones could retrieve her umbrella. He followed her inside, closing and locking the door behind them and refusing to allow Jones to exit the gym for approximately five minutes. Pl.'s Opp., Stmt. of Material Fact, at 4 ¶¶ 15, 18. Ellison asked Jones to kiss him, explaining that he was attracted to her "and to the 'red lipstick' she wore [and] that he thought she had 'sexy lips' and was very 'sexy[,]'" then he "grabbed her coat in a bear hug and physically began pulling Ms. Jones toward him" in an attempt to force Jones to kiss him. Pl.'s Opp., Stmt. of Material Facts, at 4 ¶¶ 15–16 (quoting Pl.'s Opp., Ex. A (Jones Dep. at 42–43)). Jones explained, "[w]e actually tussled. We tussled. And I asked him to get off me." Pl.'s Opp., Ex. A (Jones Dep.), at 43. Jones was detained in the gym until, upon hearing Jones' scream, one Corporal Grayton intervened and she was allowed to leave Def.'s Mot. for Summ. J., Ex. C (Pl.'s Answers to Interrogs.), at 6. The Court will refer to this occurrence as the "gym incident" for the remainder of this Opinion.

In early January 1998, two weeks after the gym incident and after Jones had been reassigned to a location in which Ellison did not work, Ellison summoned Jones to the "ops office," claiming that he needed to speak with Jones about an "evaluation." Pl.'s Opp., Stmt. of Material Fact, at 4 ¶ 19; Def.'s Mot. for Summ. J., Ex. C (Pl.'s Answers to Interrogs.), at 6; Pl.'s Opp., Ex. A (Jones Dep.), at 50. When Jones arrived in the ops office, Ellison closed the door behind her and tried to kiss her. *Id.* at 5 ¶ 20. Ellison then explained, presumably after Jones rebuffed his advances, that there was no evaluation to discuss. *Id.* There was no physical contact on this occasion as there was in the gym incident. *See* Pl.'s Opp., Ex. A (Jones Dep.), at 51–52 ("Q: Now ... during [the office] incident, did he again grab you? A: No..... Q: [T]here was no physical contact? A: No."). The Court will refer to this occurrence as the "office incident" for the remainder of this Opinion.

Another two weeks later, in mid-January 1998, Jones was in the mess hall when Ellison approached her, commenting, "I can tell you what size underwear you wear." Def.'s Mot. for Summ. J., Ex. C (Pl.'s Answers to Interrogs.), at 7. At that time, Ellison also told Jones "you have big breast [sic] and I dream of licking them," Def.'s Mot. for Summ. J., Ex. C (Pl.'s Answers to Interrogs.), at 7, and "brushed himself up behind Ms. Jones 'with his whole body.'" Pl.'s Opp., Stmt. of Material Facts, at 6 ¶ 25 (quoting Pl.'s Opp., Ex. A (Jones Dep.), at 61). The Court will refer to this occurrence as the "mess hall incident" for the remainder of this Opinion.

It is unclear precisely what actions Ms. Jones took between September 1997 and January 1998, the time period when these incidents were occurring. After the gym incident, Jones spoke to one Sergeant Armstrong about Ellison's behavior. *See* Pl.'s Opp., Ex. A (Jones Dep.), at 44–45. Armstrong "told [Jones] that he would talk to Ellison because Ellison knew that he was wrong and that he shouldn't have done that." *Id.* at 45. Again, it is unclear from the record whether Armstrong was a supervisor, or whether he had any supervisory authority over Ellison. The plaintiff seems to have thought that Armstrong was in a position to take some effective action, however, as she "believe[d] [Armstrong] was the senior sergeant at the time . . . ." Pl.'s Opp., Ex. A (Jones Dep.), at 59.

After Jones rebuffed Ellison during the office incident, she "explained to him how he made me feel very uncomfortable and that he needed to cease his behavior, that I was married and I didn't want to get other people involved." Pl.'s Opp., Ex. A (Jones Dep.), at 51. Additionally Jones again reported the incident to Sergeant Armstrong. It does not appear from the record that Jones took any action at all after the mess hall incident or reported it

to anyone. Jones stated that no further incidents of sexual harassment occurred after the mess hall incident. *See* Pl.'s Opp., Ex. A (Jones Dep.), at 58.

Approximately two and a half months after the mess hall incident, on April 9, 1998, Jones lodged a sexual harassment complaint against Ellison with the Department of Corrections. That same day, the Department of Corrections issued cease and desist letters to both Jones and Ellison, which provided that "the complainant and the respondent [must] avoid unnecessary contact with each other while the allegations in question are being investigated." Def.'s Mot. for Summ. J., Exs. F, G (Mem. from Anita B. Michelow, Acting Warden of the Occoquan Facility, to Angela Jones, April 9, 1998; Mem. from Michelow to Darryl Ellison, April 9, 1998). The department conducted an internal investigation of Jones' allegations, concluding on May 28, 1998 that there was insufficient evidence to support a finding of probable cause that Ellison had sexually harassed Jones. *See* Def.'s Mot. for Summ. J., Ex. H (D.C. Dep't of Corrections Sexual Harassment Investigation Rep., "Summary"). The cease and desist letters were continued in effect and Ellison was directed to attend "supervisors training" as a result of the investigation. *Id.* ("Recommendation"). Jones had no further personal contact with Ellison after the cease and desist letters were distributed, and no further incidents of sexual harassment are alleged to have occurred after April 9, 1998. See Pl.'s Opp., Ex. C (EEOC "Charge of Discrimination") ("I have not been sexually harassed since [the Department of Corrections completed its internal investigation].").

During the pendency of Jones' complaint, Jones' shift was changed several times, including one period of time when she was assigned to the night shift, which

"imposed increased daycare burdens" on Jones. Pl.'s Opp., Ex. B (Jones Decl.), at ¶ 14. Jones petitioned for a return to the day shift, which request was granted in August 1998, but the Department continued to "change[ ] [Jones'] duty locations and days off over the subsequent weeks." *Id.* On October 15, 1998, Jones was assigned to "tower duty," which is "a very undesirable position in the facility" because the tower is "drafty and unheated in the cold weather;" "not air conditioned and very uncomfortable during hot, humid days;" "infested with bugs;" and lacking in adequate "bathroom facilities." *Id.* at ¶¶ 15, 16. This duty eventually became permanent, and Jones was "barred from entry into the [Occuquan] institution." *Id.*, ¶ 15. Jones perceived her assignment to the tower to be punishment, and she was advised by a co-workers that "placement in the Tower is a form of punishment so you must have pissed off someone . . . ." Def.'s Mot. for Summ. J., Ex. C (Pl.'s Answers to Interrogs.), at 7.

On August 4, 1998, Jones filed a discrimination complaint with the federal Equal Employment Opportunity Commission ("EEOC"), alleging that she was sexually harassed by Ellison. Jones argued both that the three incidents discussed herein constituted sexual harassment and gender discrimination in violation of Title VII of the Civil Rights Act, and that Ellison had, by way of verbal abuse, retaliated against her after she filed her complaint. See Pl.'s Opp., Ex. C (EEOC "Charge of Discrimination," filed August 4, 1998); Pl.'s Opp., Ex. E (EEOC "Determination," issued Mar. 24, 2000) ("[W]itness testimony verifies that Charging Party was verbally harassed by the alleged bad actor after she filed the internal grievance. Witness testimony verifies that the shift supervisor referred to Charging Party as a 'Red Bitch' and a 'Damn Liar.' "). On March 24, 2000, the EEOC completed its investigation of

Jones' claims and issued a declaration finding that "it is reasonable to conclude that Charging Party was sexually harassed and retaliated against for complaining in violation of Title VII of the Civil Rights Act of 1964, as amended." Pl.'s Opp., Ex. E (EEOC "Determination," issued Mar. 24, 2000). It was during the pendency of this EEOC complaint that Jones was moved to tower duty, which she perceived to be further retaliation.

On September 6, 2000, Jones filed a complaint in this Court, which was amended on September 18, 2000. Named as defendants are the District of Columbia Department of Corrections, Sergeant Darryl Ellison, Captain William Brooks, Lieutenant Karen Gray, Lieutenant Betty Ames, District of Columbia Department of Corrections Warden Patricia Britton–Jackson, and District of Columbia Department of Corrections Director Odie Washington. Brooks, Gray, and Ames were named as defendants due to their participation in the internal grievance investigation into Jones' complaint, during which "they each had the authority to take prompt corrective action against Sgt [sic] Ellison or had the authority to tell someone who is in a position to take prompt corrective action against him but [they] failed to do so . . . ." Pl.'s Compl. at 5 ¶. All the non-institutional defendants were sued both in their official and individual capacity.

The complaint alleges: (1) sexual harassment in violation of both Title VII's prohibition on gender discrimination and the similar prohibition in the District of Columbia Human Rights Act; (2) retaliatory action by the defendants upon learning of Jones' complaints, also in violation of Title VII; (3) negligent hiring and retention by the D.C. Department of Corrections in hiring and retaining Ellison; (4) creation of a hostile work environment and race discrimination in violation of the Dis-

trict of Columbia Human Rights Act; (5) common-law assault and false imprisonment against Ellison, and vicariously against the Department of Corrections, for the gym incident; and (6) intentional infliction of emotional distress. See Pl.'s Compl., ¶¶ 26–51 (Counts I–VI). For these alleged violations, Jones requested aggregate compensatory damages in the amount of $43,400,000 and aggregate punitive damages in the amount of $ 85,900,-000.

Three years later, on October 24, 2003, the defendants filed their motion for summary judgment. Jones filed her opposition to that motion on January 7, 2004, and the defendants replied on January 14, 2004. Upon consideration of the defendants' motion, the opposition, the reply, the applicable law, and the record in this case, the Court granted the defendants' motion for summary judgment, denied Jones' pending motion to amend her complaint yet again, and dismissed the case with prejudice in two Orders issued September 30, 2004.

### DISCUSSION

#### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment when the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A disputed issue of material fact is genuine and therefore precludes summary judgment where the

Court determines that a reasonable jury could conceivably find in favor of the non-moving party on that factual issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, even where a genuine issue exists as to some material fact, the movant is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

As a general rule, when adjudicating a motion for summary judgment, the Court must "assume the truth of all statements proffered by the party opposing summary judgment" and construe all evidence in favor of the non-moving party. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999). *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Carter v. Greenspan,* 304 F.Supp.2d 13, 21 (D.D.C.2004). Indeed, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See also Washington Post Co. v. United States Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989). However, "some statements are so conclusory as to come within an exception to" the general rule that the non-movant's statements must be fully credited when adjudicating a motion for summary judgment. *Greene,* 164 F.3d at 675 (citing as examples *Delange v. Dutra Constr. Co.,* 153 F.3d 1055, 1058 (9th Cir.1998); *Lefkowitz v. Citi–Equity Group, Inc.,* 146 F.3d 609, 611 (8th Cir.1998)). Thus "wholly conclusory statements for which no supporting evidence is offered" need not be taken as true for summary judgment purposes. *Carter,* 304

F.Supp.2d at 21 (citing *Greene,* 164 F.3d at 674–75).

In order to survive a motion for summary judgment, a plaintiff must at least present evidence upon which a reasonable jury could find that a prima facie case for liability has been established. *See Taylor v. Small,* 350 F.3d 1286, 1292 (D.C.Cir. 2003) (affirming district court's grant of summary judgment for plaintiff's failure to sufficiently make out prima facie case for discrimination and retaliation); *see also Carter,* 304 F.Supp.2d at 20 n. 5 (reiterating this standard in a Title VII sexual harassment case). The non-moving party must establish more than the "mere existence of a scintilla of evidence" in support of its claims. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. In order to prevail, the non-movant's opposition must contain more than "unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." *Carter,* 304 F.Supp.2d at 21. *See* FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. In fact, summary judgment may issue where the movant points to a substantial lack of evidence in the non-movant's case; *see Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; or where the movant demonstrates that the non-movant has failed to proffer "evidence in which the jury could reasonably find for" the non-moving party. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Courts evaluating motions for summary judgment in discrimination cases are advised to proceed with additional caution and to apply a heightened degree of scrutiny. *See Waterhouse v. Dist. of Columbia,* 124 F.Supp.2d 1, 4 (D.D.C.2000), *aff'd,* 298 F.3d 989 (D.C.Cir.2002); *Calhoun v. Johnson,* 1998 WL 164780, at *3 (D.D.C.1998), *aff'd.* 1999 WL 825425 (D.C.Cir.1999). However, even under this heightened standard, a discrimination plaintiff "is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Waterhouse,* 124 F.Supp.2d at 4 (quoting *Calhoun,* 1998 WL 164780 at *3). Local Civil Rule 7(h) provides that oppositions to motions for summary judgment "shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the part of the record relied on to support the statement."

## B. Jones' Common Law Claims

The defendants argue and the plaintiff concedes that the claims in Count V of the amended complaint—namely the common-law tort claims of assault and false imprisonment against Ellison and the Department of Corrections vicariously, *see* Pl.'s Compl. at ¶¶ 44–47 (Count V)—are barred by the one-year statute of limitations set out in D.C.Code § 12–301(4). *See* Def.'s Mot. for Summ. J. at 19–20; Pl.'s Opp. at 20. The Court agrees. The gym incident, which gives rise to these tort claims, occurred in December 1997. Jones' complaint, however, was not filed until September 2000, well outside the statutory limitations period. There being no argument that the limitations period should be tolled in this case, the defendants are entitled to judgment in their favor as a matter of law on Count V.

█ The defendants are similarly entitled to judgement as a matter of law with respect to Jones' other two common law claims: negligent hiring and retention and intentional infliction of emotional distress

against the Department of Corrections because Jones has failed to comply with statutory prerequisites for bringing claims for damages against the District of Columbia and its subdivisions.[1] *See* Pl.'s Compl. at ¶¶ 33–34, 48–51 (Counts II & VI). Section 12–309 of the D.C.Code provides that:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstance of the injury or damage

Jones must comply with D.C.Code § 12–309 in order to maintain her common law claims against the Department of Corrections, a subdivision of the District of Columbia, in this case. Of course, the Court need not reach the issue of Jones' compliance with this notification provision in dismissing her assault and false imprisonment claims, as Jones has conceded that those claims are time-barred. With respect to Jones' negligent hiring/retention and intentional infliction of emotional distress claims, both of which are lodged solely against the Department of Corrections and not against Ellison individually, the issue of compliance with this provision is both material and dispositive.

■■■ Because § 12–309 "is in derogation of the common law concept of sovereign immunity, it must be strictly construed in favor of the sovereign, i.e., against waiver of immunity." *Campbell v. District of Columbia*, 568 A.2d 1076, 1078 (D.C.1990) (citing *Pitts v. District of Co-*

*lumbia*, 391 A.2d 803, 807 (D.C.1978)). Notice under this provision is 'a "condition precedent" to filing suit against the District;' *Gwinn v. District of Columbia*, 434 A.2d 1376, 1378 (D.C.1981) (quoting *Wilson v. District of Columbia*, 338 A.2d 437 (D.C.App.1975)); and is designed to "ensure that District officials [are] given prompt notice of claims for potentially large sums of money so that they could: quickly investigate before evidence became lost or witnesses unavailable; correct hazardous or potentially hazardous conditions; and settle meritorious claims." *Gwinn*, 434 A.2d at 1376. *See also* H.R.Rep. No.2010 (1933) (describing purposes of the notice provision). Here, because the Department of Corrections is an agency within the District of Columbia government, the rationale for the notice requirement is fully implicated by Jones' claims and must therefore be satisfied for those claims to proceed.

There is only one exception to this requirement of actual written notice to the District prior to filing claims for damages, and that is that "written notice should not be a prerequisite to legal action if, in fact, actual notice in the form of a *police report* has been received by the District." *Allen v. District of Columbia*, 533 A.2d 1259, 1262 (D.C.1987) (discussing D.C.Code § 12–309's provision that "[a] report in writing by the Metropolitan Police Department, in the regular course of duty, is a sufficient notice under this section") (emphasis added). This Court has adopted and applied the District of Columbia Court of Appeals' strict construction of this notice requirement. *See, e.g., Powell v. District of Columbia*, 645 F.Supp. 66, 68–70

---

1. As the Court explains infra, the District of Columbia, and not any subdivisions, departments, or agencies thereof, is the only suable entity on claims for legal and equitable relief such as this. This conclusion further convinces the Court of the appropriateness of applying the notice requirement discussed here to Jones' common-law claims against the Department of Corrections.

(D.D.C.1986) (dismissing a variety of common law claims against the District solely for the plaintiff's failure to provide notice as required by § 12–309).

Jones argues that she provided notice of her common law claims to the District "on at least two separate occasions." Her internal complaint to the department of corrections, as well as her EEOC complaint, Jones argues, satisfy the requirements of § 12–309. *See* Pl.'s Opp. at 20. This argument, however, is unavailing. It is undisputed that Jones did not submit written notice to the District as prescribed by the statute, and the District of Columbia Court of Appeals has held that, absent such written notice, *only* a police report may serve as a substitute. *See Campbell,* 568 A.2d at 1078. That Court has rejected fire reports, reports of the United States Attorney's office, and reports of criminal trial proceedings as unacceptable substitutes for actual notice of claims under § 12–309. *See id.; Jenkins v. District of Columbia,* 379 A.2d 1177, 1178 (D.C.1977) (U.S. Attorney's reports and criminal trial reports were inadequate notice under § 12–309); *Eskridge v. Jackson,* 401 A.2d 986, 989 n. 6 (D.C.1979) (police reports but not FBI reports allowed to substitute for actual notice under § 12–309).

Jones has cited no precedent nor made any argument that persuades this Court to depart from the established construction of § 12–309 that has been reiterated and applied time and again in the District of Columbia Court of Appeals. Thus, the Court finds that Jones' internal D.C. Department of Corrections and EEOC complaints do not constitute adequate notice under § 12–309 as a matter of law; and that there is nothing in the record to indicate that notice was otherwise given in a proper form. Thus, the defendants are entitled to judgment as a matter of law on Jones' remaining common law claims. For the foregoing reasons, the Court granted summary judgment in favor of the defendants' on Counts II, V, and VI of Jones' complaint in its Order issued September 30, 2004. Counts I, III, and IV, then, are all that remain for further discussion.

## C. Parties to the Case and Jones' Claims Under the D.C. Human Rights Act

 The defendants argue, the plaintiff concedes, and the Court agrees that the only proper defendant in this case is the District of Columbia. As an initial matter, naming the D.C. Department of Corrections as a defendant was inappropriate as a matter of law, as "agencies and departments within the District of Columbia are not suable as separate entities." *Does I through III v. District of Columbia,* 238 F.Supp.2d 212, 222 (D.D.C.2002) (quoting *Gales v. District of Columbia,* 47 F.Supp.2d 43, 48 (D.D.C.1999)); *see also Arnold v. Moore,* 980 F.Supp. 28, 33 (D.D.C.1997) ("[g]overnmental agencies of the District of Columbia are not suable entities"); *Fields v. District of Columbia Dep't of Corrections,* 789 F.Supp. 20, 22 (D.D.C.1992) (holding that the D.C. Department of Corrections may not be sued as a separate entity). The D.C. Department of Corrections is *non sui juris,* and thus the Court has no personal jurisdiction over claims against it as an entity distinct from the District of Columbia. However, as the defendants seem to stipulate that Jones properly substituted the District as a defendant in her response to the defendants' summary judgment motion, *see* Def.'s Answer at 1, n. 1; Pl.'s Opp. at 2–3, the Court will proceed as though Jones had brought her Title VII and D.C. Human Rights Act claims against the District in the first instance.

 Furthermore, with the District substituted for the Department of Corrections

as a named defendant, Jones' claims must be dismissed to the extent that they are also lodged against Ellison, Brooks, Gray, Ames, Britton–Jackson, and Washington in their official capacity. "Because an official capacity suit against an individual is the functional equivalent of a suit against the employer," suits containing claims against both an employer and employees in their official capacities are a "redundant and an inefficient use of judicial resources." *Cooke–Seals v. District of Columbia,* 973 F.Supp. 184, 187 (D.D.C.1997). *See Gary v. Long,* 59 F.3d 1391, 1399 (D.C.Cir.1995). For the sake of judicial economy, official capacity claims against the employees are generally held to "merge" into the claims against the employer when both employees and employer are named as defendants. *See Cooke–Seals,* 973 F.Supp. at 187 (dismissing plaintiff's ADA and Title VII claims against employees in their official capacities where plaintiff also named employer as a defendant). Jones concedes that the official capacity claims against Ellison, Brooks, Gray, Ames, Britton–Jackson, and Washington must be dismissed for this reason. *See* Pl.'s Opp. at 3.

■ Jones cannot maintain claims under Title VII against Ellison, Brooks, Gray, Ames, Britton–Jackson, and Washington in their individual capacity, as that statute only allows for suits against "employers." *See* 42 U.S.C. § 2000e–2(a) ("It shall be an unlawful employment practice for an *employer* ...") (emphasis added). *See also Gary,* 59 F.3d at 1399 (holding that Title VII only allows for relief against the employer, and not against an employee in his individual capacity whose conduct formed the basis of the claim) (citing *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.

1991) ("relief granted under Title VII is against the *employer,* not individual employees whose actions constituted a violation of [Title VII]") (emphasis in original)). Therefore, Jones' sexual harassment and retaliation claims brought under Title VII, *see* Pl.'s Compl. ¶¶ 26–32, 35–38 (Counts I & III), may proceed only against the District of Columbia, her employer, and not against the named defendants in their individual capacities.

■ The same reasoning applies to the claims in Counts III and IV of Jones' complaint alleging retaliation and the creation of a hostile work environment in violation of the District of Columbia Human Rights Act ("DCHRA").[2] The DCHRA, like Title VII, prohibits certain discriminatory practices "[b]y an *employer.*" D.C.Code § 2–1402.11(a)(1) (emphasis added). It is uniformly held that "the DCHRA looks to Title VII for its construction." *MacIntosh v. Bldg. Owners & Mgrs. Assoc. Int'l,* 310 F.Supp.2d 240, 244 (D.D.C.2004). *See also Sparrow v. United Air Lines,* 216 F.3d 1111, 1114 (D.C.Cir. 2000) (same analysis applied to Title VII discrimination claims controls discrimination cases brought under the DCHRA); *Carpenter v. Federal Nat. Mortg. Ass'n,* 165 F.3d 69, 72 (D.C.Cir.1999) (D.C. Courts rely on federal-court interpretations of Title VII when evaluating DCHRA discrimination claims). Thus, Jones' claims against the named defendants in their individual capacities for violations of the anti-discrimination provisions of the DCHRA fail for the same reason that she cannot sue these defendants individually under Title VII—that is, both statutes require that the defendant be an "employer"

---

**2.** Count IV of the Jones' complaint indicates that it also states a claim for race discrimination in violation of the DCHRA. However, neither the complaint nor any other pleading or part of the record alleges any facts to support such a claim, and the parties ignore the claim in arguing the motion for summary judgment. Thus, the Court will assume that Jones has abandoned the claim and it will not be discussed further here.

within the meaning of Title VII. Jones concedes this much as well. *See* Pl.'s Opp. at 3.

■ Finally, Counts III and IV of Jones' complaint cannot proceed against the one remaining defendant, the District of Columbia, insofar as they allege violations of the DCHRA. As the plaintiff herself stipulates, *see* Pl.'s Opp. at 4 n. 3, the private right of action established by the DCHRA for discrimination claims is not available to District of Columbia employees suing the District. *Holland v. Board of Trustees of the University of the District of Columbia*, 794 F.Supp. 420, 422 (D.D.C.1992); *Rasul v. District of Columbia*, 680 F.Supp. 436, 439 (D.D.C.1988); *Dougherty v. Barry*, 604 F.Supp. 1424, 1442 (D.D.C.1985); *Williams v. District of Columbia*, 467 A.2d 140, 141–42 (D.C. 1983). The District, as the only remaining defendant in the case, is thus entitled to judgment as a matter of law as to Counts III and IV, insofar as they claim relief for violations of the DCHRA by the District. Because Count IV contains *only* claims under the DCHRA, Count IV fails entirely. Count III remains partially intact, as it alleges violations of both the DCHRA and Title VII.

In light of the foregoing, the only legally cognizable claims remaining in this case are Count I and part of Count III—Jones' claims of sexual harassment and retaliation in violation of Title VII of the 1964 Civil Rights Act. The only remaining defendant in the case is the District of Columbia. The Court's reasoning in granting the defendants' motion for summary judgment in favor of the District with respect to those two claims is set forth below.

### D. Title VII Claims

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex …." 42 U.S.C. § 2000e–2(a) (1988). The Supreme Court has held that the phrase "terms, conditions, or privileges of employment," as it is used in this provision, "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted). Sexual harassment has been recognized as a form of sex-based discrimination. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ("Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex.") (citation omitted).

■ A claim of sexual harassment is cognizable under Title VII if the conduct at issue "alters, either expressly or constructively, the terms or conditions of an individual's employment." *Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C.Cir.1999) (per curiam). An explicit alteration in employment conditions is what courts refer to as *"quid pro quo"* harassment, while a constructive alteration is known as "hostile work environment" harassment. *Curry*, 195 F.3d at 659 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). While the former is always actionable, the latter must be "severe or pervasive" to give rise to liability. *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Harris*, 510 U.S. at 21, 114 S.Ct. 367).

 Plaintiffs have the burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To carry this burden for a discrimination claim, a plaintiff must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable employment action gives rise to an inference of discrimination. *Stella v. Mineta,* 284 F.3d 135, 145 (D.C.Cir.2002); *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999). To make out a prima facie case for retaliation, the plaintiff must demonstrate that: (1) she was engaged in a statutorily protected activity; (2) the employer took an adverse personnel action against her; and (3) a causal connection exists between her protected action and the employer's adverse action. *Brody,* 199 F.3d at 452; *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985); *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984).

If the plaintiff makes out her prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for its actions. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The defendant need not, however, "persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089. If the employer produces a nondiscriminatory reason for the action that the plaintiff alleges was discriminatory, then the burden shifts back to the plaintiff to show that the nondiscriminatory reason proffered was in fact a pretext for discrimination or retaliation—that is, that "the employer's proffered explana-

tion is unworthy of credence." *Sanderson Plumbing,* 530 U.S. at 143, 120 S.Ct. 2097. Despite this back-and-forth shifting of "intermediate evidentiary burdens," however, " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). It is within this framework of production and persuasion that Jones' remaining claims and the defendants' arguments for summary judgment will be addressed.

### 1. Count I: Sexual Harassment

Jones, in Count I of her Complaint, alleges that Ellison's conduct constituted sexual harassment in violation of Title VII, and seeks to hold the District vicariously liable for that conduct. Courts have found sexual harassment to rise to the level of discrimination that violates Title VII in two circumstances: where there is a grant or denial of an economic *quid pro quo* in exchange for sexual favors; *Curry,* 195 F.3d at 659; *see, e.g., Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 782–83 (1st Cir.1990); *Highlander v. K.F.C. Nat'l Mgt. Co.,* 805 F.2d 644, 648 (6th Cir.1986); or where the harassment creates a hostile or abusive working environment. *Curry,* 195 F.3d at 659; *see, e.g., Meritor,* 477 U.S. at 66, 106 S.Ct. 2399; *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 575 (10th Cir.1990).

 Importantly, because Title VII only prohibits *employers* from engaging in sex-based discrimination, courts must determine when it is appropriate to hold an employer liable for harassment of one employee by another. *See Gary,* 59 F.3d at 1395. Even when it is undeniable that an employee was in fact sexually harassed, employer liability for sexual harassment

under Title VII is not automatic, as the Supreme Court in *Meritor* noted: "Congress' decision to define 'employer' to include any 'agent' of an employer surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." *Meritor*, 477 U.S. at 72, 106 S.Ct. 2399. That is, for either type of sexual harassment claim, a plaintiff must show both that the elements of the Title VII violation are satisfied and that there is a basis for imposing liability on the employer for that violation in order to make out a prima facie case. After *Meritor*, the Supreme Court further clarified the conditions for employer liability under Title VII, holding that:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages subject to proof by a preponderance of the evidence .... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that the employee failed to take advantage of any preventive or corrective opportunities provided by the employer or avoid harm otherwise.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

 Importantly, this *Faragher* affirmative defense is not available, and thus vicarious liability *is* automatic, "when the supervisor's harassment culminates in a *tangible job action*, such as discharge, demotion, or undesirable reassignment."

*Faragher*, 524 U.S. at 808, 118 S.Ct. 2275 (emphasis added). There is an additional distinction in the application of employer liability for sexual harassment under Title VII when the agent that is alleged to have harassed the plaintiff is not the plaintiff's supervisor, but rather a co-employee with no supervisory authority over the plaintiff. *See Curry*, 195 F.3d at 659 (citing *Ellerth*, 524 U.S. at 760–63, 118 S.Ct. 2257); *Id.* at 659 n. 10 (collecting cases). Employer liability for co-worker harassment is uniformly determined under a negligence standard—that is, the employer's liability will turn on whether it knew or should have known of the conduct. *See Faragher*, 524 U.S. at 799, 118 S.Ct. 2275 (citing, among numerous examples, *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872–73 (6th Cir.1997); *Fleming v. Boeing Co.*, 120 F.3d 242, 246 (11th Cir.1997); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997); *Yamaguchi v. United States Dep't of Air Force*, 109 F.3d 1475, 1483 (9th Cir.1997)); *Curry*, 195 F.3d at 659 n. 10 (listing cases in various circuits applying the negligence standard to cases of co-worker harassment). More specifically, in this jurisdiction an employer may be held vicariously liable under Title VII for co-worker harassment if the plaintiff can show that "the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry*, 195 F.3d at 660.

In order to decide whether the District is entitled to favorable summary judgment on Jones' sexual harassment claim, then, the Court must determine: (1) whether Jones has produced sufficient evidence to establish a genuine issue of material fact as to whether Ellison's conduct rises to the level of discrimination in violation of Title VII;[3] and, if so, then (2) whether Jones

---

**3.** It is unclear from the pleadings and supporting material whether Jones alleges that

has produced sufficient evidence to establish a genuine issue of material fact as to the District's liability for Ellison's conduct under the governing law. To make the second determination, the Court must first address the threshold issue of whether Ellison was Jones' supervisor or her co-worker in order to arrive at the appropriate legal standard governing the District's vicarious liability.

*i. The Supervisor/Co-worker Distinction*

 The Supreme Court, in discussing the reasons that harassment by supervisors ought to be treated differently than the harassment of one co-worker by another, explained that "the victim may ... be reluctant to accept the risks of blowing the whistle on a superior ... [and] an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker." *Faragher*, 524 U.S. at 803, 118 S.Ct. 2275. Because Title VII does not define "supervisor," the Court's understanding of the term must be guided by agency principles and the purposes of Title VII. *Accord Faragher*, 524 U.S. at 790–91, 118 S.Ct. 2275; *Meritor*, 477 U.S. at 72, 106 S.Ct. 2399. Heightened employer liability is appropriate in the context of supervisor harassment because a supervisor's conduct is often made possible by an "abuse of his supervisory authority," the supervisor's apparent authority from the point of view of the subordinate, or because the supervisor's position aided him in accomplishing the harassment. *See*

*Faragher*, 524 U.S. at 801–02, 118 S.Ct. 2275 ("in implementing Title VII is makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by use of his supervisory authority ...."). This heightened employer liability for supervisor harassment is also desirable because, generally, "acts of supervisors have greater power to alter the environment than acts of co-employees ...." *Id.* at 805, 118 S.Ct. 2275.

 For these reasons and others, the Supreme Court has made it easier for employees to establish sexual harassment claims when the alleged harasser is a supervisor than when the alleged harasser is a co-worker. In the former case, a victim may hold her employer liable on a vicarious liability theory, but in the latter case, a plaintiff may not recover against her employer unless she can show that the employer was negligent with respect to the co-worker's harassing conduct.[4] *See Curry*, 195 F.3d at 660. Because increased employer liability for supervisor harassment is predicated on misuse of supervisory authority, courts determine supervisory status for Title VII liability purposes by the extent of the authority the purported supervisor possessed over the plaintiff. *See Wright–Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1271 (10th Cir.1998) (whether the purported supervisor "had sufficient control over the plaintiff to be considered her supervisor ..." is the oper-

---

Ellison's conduct constitutes *quid pro quo* harassment, the creation of a hostile work environment, or both. Because summary judgment requires all inferences to be made in favor of the non-moving party, however, the Court will treat the plaintiff's complaint as though it alleges both these forms of sexual harassment.

**4.** Although the evidence establishing employer liability will be substantively similar in the supervisor-harassment and co-worker-harassment contexts, the distinction lies in which party bears the burden of proof. In the former case, the employer bears the burden of showing that its remedial measures were adequate; in the latter, the burden of showing the inadequacy of the employer's response to harassment rests with the plaintiff. *See Curry*, 195 F.3d at 660.

ative question in determining supervisory status); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1033 (7th Cir.1998) (same).

■ After *Faragher*, cases indicate that supervisor status for the purpose of Title VII liability depends on whether the authority exercised by the purported supervisor was "of a substantial magnitude." *Parkins*, 163 F.3d at 1034. *See, e.g., Deffenbaugh–Williams v. Wal–Mart Stores, Inc.*, 156 F.3d 581, 592 (5th Cir.1998) (where employee had authority to discharge plaintiff, employee was a supervisor under *Faragher*); *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888 (8th Cir.1998) (store manager was a supervisor for Title VII liability purposes due to degree of authority he exercised over the plaintiff); *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 179 (4th Cir.1998) (where harasser had authority to "hire and fire sales representatives" such as the plaintiff, harasser was a supervisor for purposes of Title VII). Thus, "it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." *Parkins*, 163 F.3d at 1034.

On no construal of the facts can it be said that Ellison had any such authority to alter Jones' working conditions. While Ellison is classified as a Sergeant and Jones as an officer, classifications that tend to indicate that Ellison has some measure of authority over Jones, the Department of Corrections stated that Ellison "is not a supervisor" in one of its internal memoranda during its investigation of Jones' harassment complaint. Furthermore, although on various occasions Ellison told Jones that he had authority to assign her overtime and perform evaluations of her job performance, she later learned that he had no such authority. Thus, as a matter of law, Ellison is not Jones' supervisor and thus that the District's liability for Ellison's conduct should be determined by application of the negligence standard discussed above. However, the District did not contest Jones' characterization of Ellison as her supervisor, and both parties argue the case as though the law governing supervisor harassment applies. Thus, the Court is not at liberty to evaluate the District's liability on the negligence standard, but must treat the issue of Ellison's supervisory status as conceded by the District and proceed accordingly. However, it should be noted that, had the District argued that the negligence standard should apply, the Court's decision here would have been considerably easier, as Jones presents no evidence sufficient to establish a genuine issue of material fact as to whether the Department of Corrections either (1) knew or should have known of Ellison's conduct; or (2) somehow proximately caused Jones' injuries by failing to quickly and adequately act on such knowledge.

*ii.* Quid Pro Quo *Sexual Harassment*

The D.C. Circuit has endorsed the view that " '[t]he gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal.' " *Gary*, 59 F.3d at 1395 (quoting *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 579 (2d Cir.1989) (initially setting forth this position)). "[E]very Court of Appeals that has considered the issue has held that sexual harassment by supervisory personnel is automatically imputed to the employer when the harassment results in *tangible detriment* to the subordinate employee." *Meritor*, 477 U.S. at 76, 106 S.Ct. 2399 (Marshall, J., concur-

ring) (emphasis added). In this jurisdiction, it takes "more than saber rattling to impose *quid pro quo* liability on an employer; the supervisor must have wielded the authority entrusted to him to subject the victim to adverse job consequences as a result of her refusal to submit to unwelcome sexual advances." *Gary*, 59 F.3d at 1396. Even repeated threats of adverse job consequences, if they are not actually carried out, do not rise to the level of *quid pro quo* sexual harassment. *See id.*

▮ Here, even construing the record in the light most favorable to Jones, there is simply no evidence that Ellison either had or "wielded" authority entrusted to him by the District to subject Jones to any tangible, adverse job consequence. Ellison's threats to give Jones a bad evaluation and to institute disciplinary procedures against her, while clearly prompted by Jones' refusal to submit to Ellison's advances, do not, in and of themselves, constitute a tangible detriment to Jones' employment conditions within the meaning of the governing law. In *Gary v. Long*, the D.C. Circuit held that even repeated threats of adverse job consequences for failure to submit to a superior's sexual advances do not constitute *quid pro quo* harassment unless they are actually carried out. *See Gary*, 59 F.3d at 1396. Ellison never carried out his threats. What is more, while Jones may have found her assignment to tower duty detrimental, there is no evidence demonstrating that Ellison was responsible for her assignment to the tower. To the contrary, the record indicates that Ellison likely did not have the requisite authority to transfer Jones to another area of the Occuquan facility. Furthermore, Jones presented evidence tending to show that her transfer to the tower, if motivated by any kind of animus at all, was motivated by her complaints about Ellison's behavior rather than her refusal to submit to Ellison's advances.

▮ And, even if there were evidence to conclusively establish that Ellison had personally transferred Jones to the tower solely because she rebuffed him, such an action does not rise to the level of a tangible detriment that supports a finding of *quid pro quo* harassment. With respect to Title VII liability generally, the Supreme Court in *Ellerth* discussed the concept of a "tangible employment action" sufficient to impose vicarious liability for discrimination. *See Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257. The *Ellerth* Court made clear that, at the very least, the action at issue must "constitut[e] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* Jones' assignment to tower duty bears none of the indicia of tangibility that the Supreme Court points to—her salary, benefits, hours, and employment responsibilities remained the same when she was transferred to the tower. At most, Jones's reassignment might be characterized as a lateral transfer.

Relying on the Supreme Court's reasoning in *Ellerth*, the D.C. Circuit addressed whether lateral transfers may be tangible employment actions that satisfy the requirements for Title VII relief, concluding that "a plaintiff who is made to undertake or who is denied a lateral transfer—that is, one in which she suffers *no diminution in pay or benefits*—does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment . . . ." *Brown*, 199 F.3d at 457 (emphasis added). And, "[m]ere idiosyncrasies of personal preference are not sufficient to state an injury"—that is, subjective dissatisfaction with working conditions

after the transfer does not constitute a "materially adverse consequence affecting the terms, conditions, or privileges of ... employment." *See id.* Here, Jones' only complaint about her transfer to tower duty is that it was uncomfortable or disagreeable for various reasons. There is no evidence to indicate that the terms, conditions, and privileges of her employment as a corrections officer were adversely effected in any way—in fact, Jones admits that *tower duty is part of her job description.* *See* Pl.'s Opp., Ex. A (Jones Dep.), at 83–84. Therefore, as a matter of both law and logic, Jones' assignment to the tower, a post that she already knew she might be assigned to as part of her job as a corrections officer, does not rise to the level of a "tangible employment action" as is required to make out a prima facie claim of *quid pro quo* sexual harassment.

### iii. Creation of a Hostile Work Environment

■ In light of the obvious futility of any *quid pro quo* harassment claim, and on the basis of the tone of the arguments and the record, it seems more likely that Count I of Jones' complaint is predicated on Ellison's creation of a "hostile work environment." "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399). Courts determine whether a work environment is sufficiently hostile to violate Title VII by examining the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employ-

ee's work performance." *Id.* at 23, 114 S.Ct. 367.

■ To make out a prima facie claim for hostile work environment sexual harassment and thus defeat summary judgment, a plaintiff must adduce evidence to show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was subjected to unwelcome sexual harassment; (3) the sexual harassment was based upon the plaintiff's sex; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance and created a hostile working environment; and (5) that there is a basis for holding the employer liable for the creation of the hostile working environment. *See Davis v. Coastal Int'l Sec., Inc.,* 275 F.3d 1119, 1122–23 (D.C.Cir.2002); *Carter,* 304 F.Supp.2d at 24 n. 11. The Court gives some deference to the determination of the EEOC that Ellison did in fact sexually harass Jones. However, despite Jones' contention to the contrary, *see* Pl.'s Opp. at 4–5, the EEOC findings are not entirely dispositive of the issue. While the EEOC's conclusion that sexual harassment occurred is entitled to some deference here, it is not binding on the Court, and there is nothing in either the text of the determination or elsewhere in the record to indicate that the EEOC applied the law that governs Title VII liability in this jurisdiction in reaching its conclusions. Specifically, no mention is made of the legal standards that control the Court's disposition of the vicarious liability of the District, including the *Faragher* affirmative defense; nor is there any reason to believe that governing law was applied to the determination that Jones was "retaliated against," as the Court will discuss below.

Be that as it may, however, the Court finds that the plaintiff's allegations here more than suffice to create a genuine issue

of material fact with respect to elements (1) through (4) of the hostile work environment claim—if Ellison's deplorable conduct toward Jones were not regarded as a legally sufficient predicate for this kind of sexual harassment claim, it is hard to imagine what sort of conduct *would* suffice. Certainly a reasonable jury could find that Ellison created a hostile work environment on these facts. The Court also finds, however, that the District has succeeded in establishing the *Faragher* defense, which negates element (5) of the plaintiff's prima facie case.

As with *quid pro quo* sexual harassment claims, general principles of agency law indicate that the plaintiff's employer should be held vicariously liable for a supervisor's creation of a hostile work environment where the plaintiff succeeds in proving that the challenged conduct satisfies the legal requirements for Title VII sexual harassment. However the Supreme Court, both in *Meritor* and *Faragher*, indicated that vicarious liability should not be quite so automatic, regardless of agency principles. *See Faragher*, 524 U.S. at 804, 118 S.Ct. 2275 (struggling to reconcile its discussing of agency principles, which point to automatic vicarious liability for sexual harassment by supervisors with *Meritor*'s holding that "an employer is not 'automatically' liable for harassment"). Jones argues that the defendants failed to assert this defense in their summary judgment pleadings, but she is simply mistaken. *See* Def.'s Mot. for Summ. J. at 17–18 (specifically asserting the *Faragher* defense with respect to Jones' Count IV, entitled "Hostile Work Environment & Discrimination Based on Race"). The defense thus raised, the Court is bound to consider it. The Court concludes that the defendants have successfully made out the *Faragher* defense, and that summary judg-

ment for the defendants on Count I is therefore appropriate.

Where sexual harassment does not "culminat[e] in a tangible employment action," an employer may avoid Title VII liability for sexual harassment by raising the affirmative defense set forth by the Supreme Court in *Faragher*. *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275. The Court has already concluded that Jones did not suffer any tangible employment action in this case; thus the District is entitled to raise the *Faragher* defense in this case. In order to prevail on the *Faragher* defense, the employer must show by a preponderance of the evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807, 118 S.Ct. 2275. With respect to the first element, the Supreme Court noted that "[w]hile proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the [*Faragher*] defense." *Id.*

Here, the D.C. Department of Corrections did have a written antiharassment policy with complaint procedure, a copy of which was provided to Jones during her training—before she began working at Lorton. While Jones alleges that the policy was *de facto* ineffective, or perhaps simply ignored in her case, it is clear that the Department in fact took *immediate* corrective action upon receipt of Jones' harassment complaint, issuing cease and desist letters to prevent further contact

between Ellison and Jones, and beginning an investigation into Jones' allegations. Jones charges that no "serious investigation of her charges conducted by finders of fact who were not biased[;]" that the internal investigation was "perfunctory and without credibility[;]" and that there was no "independent decision making process because the persons selected to be factfinders were friends of ... defendant Ellison." Pl.'s Opp. at 18. However, these conclusory statements are devoid of any factual support in the record, and the Court will not credit them here.

 "Although, as a rule, statements made by the party opposing summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." *Greene,* 164 F.3d at 675. Here, because Jones alleges no facts to support her indictments of the objectivity of the Department's internal investigation, the Court finds that her statements are of just the conclusory sort that our circuit has indicated need not be accepted as true in the summary judgment context. There is no basis in the record for the contention that the Department's investigation was biased against Jones, or that its conclusions are somehow suspect. To the contrary, the record indicates that the Department's antiharassment policy and complaint procedure worked as well as could be expected. The Department took remedial action *the very same day* that Jones' complaint was received in order to prevent any further incidents from occurring during the pendency of the investigation.

In addition, despite the final conclusions of the investigatory panel that there was insufficient evidence to support a probable cause finding of sexual harassment, the Department took the additional precautionary measure of continuing the cease-and-desist orders in effect indefinitely, to prevent any future unpleasant interactions between Jones and Ellison. Importantly, Jones concedes that the Department's efforts were wholly effective, admitting that Ellison did not harass her again after the cease-and-desist letters took effect. *See* Pl.'s Opp., Ex. C (EEOC "Charge of Discrimination") ("I have not been sexually harassed since [the Department of Corrections completed its internal investigation]."). Indeed, the Court is left wondering what more Jones could have hoped for under the circumstances. Accordingly, the Court finds that the Department acted with the appropriate measure of reasonable care under the circumstances, and has thus fully satisfied the first element of the *Faragher* affirmative defense.

As to the second element of the *Faragher* defense, the Supreme Court explained that "proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, [but] a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275. Our Court has recently considered, in a factually similar case, what kinds of conduct by sexual harassment victims may constitute a failure to exercise reasonable care for the purposes of the *Faragher* defense. In *Cromer–Kendall v. District of Columbia,* the Court considered the claims of a D.C. Metropolitan Police officer that her superior officer sexually harassed her and created a hostile working environment. *See generally* 326 F.Supp.2d 50 (D.D.C.2004).

In *Cromer–Kendall,* the plaintiff alleged that, on several occasions, a female Metropolitan Police Department ("MPD") sergeant made sexual advances toward her,

including stripping naked from the waste down in the plaintiff's kitchen and caressing the plaintiff's breast in the sergeant's office. *See Cromer–Kendall,* 326 F.Supp.2d at 53–55 (discussing the factual background of the case). After the first major incident of harassing conduct, the plaintiff reported the sergeant's conduct to one Sergeant Thomas who, at the time, "was the plaintiff's first-line supervisor." *Id.* at 53–54, 53 n. 3. Sergeant Thomas assured the plaintiff that he would "take care of the matter." *Id.* at 54. After the second major incident of harassment, the plaintiff again complained to Sergeant Thomas, who again agreed to intercede on her behalf. *Id.* Around that same time, however, the plaintiff in *Cromer–Kendall* also reported the incident to one Deputy Chief Musgrove, who "instructed the plaintiff to immediately report her complaints to the MPD's Equal Employment Opportunity ("EEO") office." *Id.* The plaintiff, "fearful of the consequences of advancing her complaint to a higher level in the police department, reported to her union steward [rather than the MPD EEO office] that she was being harassed by [the sergeant]." *Id.* Finally, after additional incidents of harassment and at the urging of her union, the plaintiff reported the incident to the MPD's EEO office. *Id.*

The Court found that the sergeant's behavior created a hostile working environment within the meaning of the relevant Title VII sexual harassment doctrine, and proceeded to evaluate the District's assertion of the *Faragher* defense. *See Cromer–Kendall,* 326 F.Supp.2d at 62–63. The Court found that the MPD's anti-harassment policy and grievance procedure were sufficient to satisfy the first element, but that the District failed to show that element two was satisfied. The District argued that the plaintiff, by waiting so long to file her formal complaint with MPD's EEO office, unreasonably failed to miti-gate her damages. The Court, however, found that the plaintiff's efforts to report the harassment by informing several superior officers, including a Deputy Chief who had authority over personnel, were sufficient to create a genuine issue of material fact as to whether the plaintiff acted reasonably to " 'take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.' " *Id.* at 64 (quoting *Faragher,* 524 U.S. at 778, 118 S.Ct. 2275). In making this determination, the Court seems to have been persuaded of the reasonableness of the plaintiff's actions because the plaintiff communicated her complaint to more than one individual who had some degree of supervisory authority over the individual who was doing the harassing.

The D.C. Circuit has noted, with respect to the second element of the *Faragher* defense, that "[t]he 'failure to avail' standard is not intended to punish the plaintiff merely for being dilatory." *Greene,* 164 F.3d at 674. Rather, the second *Faragher* element "reflects an ... obvious policy imported from the general theory of damages, that a victim has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of [Title VII]." *Faragher,* 524 U.S. at 806, 118 S.Ct. 2275 (citations omitted). That is, if the plaintiff could have avoided suffering harm by taking some action that a reasonable person in the plaintiff's position would likely take, "no award against a liable employer should reward a plaintiff for what her own efforts could have avoided." *Id.* at 807, 118 S.Ct. 2275. Damages suffered from a hostile working environment, then, should not be imposed vicariously against an employer where some reasonable action by the plaintiff after the first incident of discriminatory conduct could have prevented the creation of that

hostile environment. After all, a single incident generally does not rise to the level of a Title VII hostile work environment, which is usually thought to be a pattern or series of harassing incidents. *See, e.g., Freedman v. MCI Telecommunications Corp.,* 255 F.3d 840, 848–49 (D.C.Cir.2001) (single anti-Semitic comment did not support finding hostile environment under Title VII); *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270–71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (reiterating the view that harassment must be "pervasive" to constitute a hostile work environment, so that isolated incidents usually do not rise to the actionable level); *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (same). Thus some corrective action taken after the first incident could prevent the hostile environment from developing at all.

 Here, the Court finds that Jones failed to act reasonably to prevent the creation of a hostile work environment. Unlike the plaintiff in *Cromer–Kendall,* who reported to several individuals with supervisory authority over the alleged harasser and to her union steward before lodging a formal complaint, Jones initially reported Ellison's conduct to Sergeant Armstrong only. Jones has alleged no facts demonstrating that Armstrong had any supervisory authority over Ellison, or

that Jones had any reasonable basis for thinking that Armstrong would be able to successfully prevent Ellison from continuing to harass Jones. To the contrary, after her initial complaint to Armstrong, Ellison's harassment continued. Although Jones stated that she thought Armstrong was the "senior sergeant" at the time the harassment was occurring, she presents no competent evidence that Armstrong in fact was the senior sergeant or that he otherwise had any authority to correct Ellison's workplace behavior or to discipline employees at all. Of course, Armstrong could have reported Ellison's behavior to the Department of Corrections, but there is no evidence that he did so, and there is no reason to believe that he was in any better position to make such a complaint than Jones herself. Considering Armstrong's apparent failure to "take care of" Ellison's conduct after Jones reported the first incident to him, one would think that a reasonable person would have reported Ellison's conduct to someone possessing greater personnel authority.[5] Jones, however, again reported to Armstrong and Armstrong only.

Furthermore, Jones waited until two months after the third substantial incident of harassment to file any formal complaint

---

**5.** Indeed, it is clear that there were individuals of greater authority to whom Jones might have reported earlier, forestalling some of the damage she sustained as a result of Ellison's harassment. After all, when she did report Ellison's conduct to the proper authorities within the department of corrections, their remedial action was immediate and fully effective. Jones presents no evidence to show that she was for some reason unaware of the proper channels through which to lodge her complaint until after the mess hall incident. To the contrary, the record indicates that Jones was appraised of the complaint procedure during her training. Thus, there seems to be no good reason why Jones did not report to some other individual possessed of greater supervisory authority either instead of or in addition to Sergeant Armstrong, especially following the second incident and Jones' realization that Armstrong had failed to correct Ellison's conduct. It is likely that even informal complaints, if made to individuals with some actual authority over Ellison, would have defeated summary judgment for the defendants as to the second element of the *Faragher* defense. *Compare Cromer–Kendall,* 326 F.Supp.2d at 53–54 (finding plaintiff's actions to prevent future harassment reasonable where she reported harassment to several individuals with authority over the alleged harasser but did not file formal complaint until later).

with the Department of Corrections. Even construing the evidence in the light most favorable to the plaintiff, there is no basis in the record upon which the Court may conclude that the Department had any reason to know of Ellison's offending conduct prior to Jones' complaint of April 9, 1998. If the plaintiff delayed complaining to the Department because she feared adverse action by Ellison, the allegation to that effect is missing from the record in this case. Jones' actions move beyond the "merely dilatory"—her failure to report Ellison's conduct to anyone who could put a stop to it baffles the Court. The Court finds that no reasonable person in Jones' position would have so delayed complaining, even if not in a formal manner, to someone with some degree of authority over Ellison. On the basis of this finding, the Court concludes that Jones did, in fact, fail to "reasonably take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 778, 118 S.Ct. 2275.

The defendants having established the *Faragher* affirmative defense, which effectively undercuts any basis upon which the District may be held vicariously liable for Ellison's conduct, the Court finds that summary judgment in favor of the defendants on Count I is appropriate in this case.

## 2. *Count III: Retaliation*

▮▮▮ In Count III of the amended complaint, Jones alleges that she was retaliated against after she complained about Ellison's behavior in the form of repeated changes in the timing of her shifts and her subsequent assignment to tower duty, which she found unsavory for reasons discussed above. To make out a prima facie retaliation claim, a plaintiff must show that "she engaged in an activity protected by

Title VII, that the employer took an adverse employment action against her, and that the adverse action was causally related to the exercise of her rights." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C.Cir.2000) (citing *Paquin v. Federal Nat'l Mortgage Ass'n*, 119 F.3d 23, 31 (D.C.Cir.1997)). The D.C. Circuit defines adverse employment actions as "tangible employment action[s] [that] constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Brown*, 199 F.3d at 456–57 (internal citations omitted).

▮▮▮ Critical to the plaintiff's prima facie retaliation claim is the showing that she suffered an adverse personnel action—that is, "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C.Cir.2002) (citing *Brown*, 199 F.3d at 457). Allegations that support an inference that the adverse personnel action at issue was undertaken with "retaliatory animus" on the part of the employer or employer's agent can satisfy the requirement that the plaintiff show causation. *See Greene*, 164 F.3d at 674. (upholding summary judgment on a retaliation claim for failure to adduce any evidence of retaliatory animus). Here, while Jones' complaints were clearly "protected activity" within the meaning of the governing law, Jones fails both to show that she suffered any adverse personnel action and that the alleged acts of retaliation were motivated by any retaliatory animus. Furthermore, there are no other facts in the record to support any inference that Jones' shift-changes and assignment to the tower were in any way causally related to her complaints about

Ellison's conduct, other than a temporal proximity of events that could just as easily be coincidental.

The Court is mindful of the logical axiom that correlation does not equate to causation in all cases—that is, simply because two events occur proximately to one another in time, even when such proximity of events appears to be a statistically regular phenomenon, there is no logical basis to conclude, without more, that one event is the cause of the other. Here, Jones knew when she accepted her position as a corrections officer that she would be subject to shift changes and to rotation into tower duty. Therefore, Jones' shift changes and assignment to tower duty may have been no more than normal incidents to her employment. This consideration makes it even more difficult, on this record, for the Court to conclude that the alterations to her shift and assignment to the tower were retaliatory. These events might just have easily occurred in the regular course of her employment with the Department of Corrections if the harassment and subsequent complaint had never occurred. Without some additional evidence of causation in the record, the Court cannot find even a genuine fact issue as to whether a causal relationship exists between Jones' complaints and the employment events at issue here. Accordingly, the Court concludes that Jones has failed to make out the necessary causation element required for a prima facie retaliation claim.

██ Furthermore, as was discussed in Section D(1)(ii) *supra,* Jones' shift changes and assignment to tower duty do not constitute tangible employment actions within the meaning of the governing legal standard. Neither of these occurrences effected Jones' pay, the net hours she worked, her benefits, or her job responsibilities. The Court concludes that no reasonable trier of fact could find that

these events constitute an "objectively tangible harm" as is required to state a prima facie retaliation claim under Title VII. Jones contends, however, that the EEOC Determination is dispositive on the issue of retaliation as well as sexual harassment. See Pl.'s Opp. at 4–5. While the Determination does state that the EEOC concluded Jones had been "sexually harassed and retaliated against," there is no evidence that the EEOC employed the legal test for retaliation that governs such claims in this jurisdiction. Furthermore, the only incidents that the EEOC considered involve "verbal abuse" of Jones by Ellison after she filed her claim. Verbal abuse, like mere threats that are not carried out, do not constitute tangible employment action. To be sure, verbal abuse may create a hostile work environment, but the Court has already noted Jones' success in establishing that she was subjected to a hostile work environment. That showing, however, is simply not relevant to the retaliation claim, which requires that the plaintiff show she suffered the type of adverse employment action that would make for a showing of *quid pro quo* sexual harassment if it occurred as punishment for refusing a sexual advance. Such tangible employment action did not occur in this case, even when the record is construed in the light most favorable to Jones. Therefore, the Court concludes that summary judgment in favor of the defendants on Count III is appropriate.

### CONCLUSION

For the foregoing reasons, the Court granted the defendants' motion for summary judgment on all counts alleged in the plaintiff's amended complaint in an Order issued September 30, 2004. There being no viable claims remaining, that Order entered judgment for the defendants and

54

dismissed the plaintiff's complaint with prejudice.