Lynn A. **PEARY**, Plaintiff,

v.

Porter **GOSS**, Director of Central Intelligence, Defendant.

No. 04CV966.

United States District Court, E.D. Virginia. Alexandria Division.

April 15, 2005.

---

■■■■■■■■■■■■■■■■■

Ellen Kyriacou Renaud, David H. Shapiro, Swick & Shapiro, P.C., Washington, DC, for Plaintiff.

Richard Parker, United States Attorney's Office, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff Lynn Peary,[1] a retired program manager for the CIA's Operations Directorate, has sued her former employer pursuant to Title VII and the ADEA for race-, sex-, and age-based disparate treatment and a racially and sexually hostile work environment. Plaintiff's claims arise from her experiences while posted to a CIA station somewhere in Latin America from September 1999 to March 2001, particularly her reassignment from one intelligence-gathering operation to another. Defendant Porter Goss, the Director of Central Intelligence, has moved to dismiss plaintiff's claims pursuant to Rule 12(b)(6), Fed. R. Civ. P., or, alternatively, for summary judgment. Because discovery in this matter is complete and both parties' pleadings are supported by evidentiary exhibits, defendant's motion is treated as one for summary judgment pursuant to Rule 56. See Fed. R. Civ. P. 12(b).

For the reasons that follow, defendant's motion must be granted.

## I.[2]

Plaintiff, a Hispanic woman over forty years old, worked for the CIA's Operations Directorate in the field of covert intelligence collection from 1984 until her retirement in 2001. Beginning in 1990 and continuing until her retirement, she held the position of program manager, in which capacity she directed specific intelligence-gathering operations abroad. In September 1999, plaintiff was posted to a CIA station in a major city in Latin America. To preserve the security and secrecy of American intelligence operations there, that city is identified in this litigation only as "the Main Location." Plaintiff's husband, who is also Hispanic and a CIA program manager, joined her at the Main Location shortly after her arrival there. Throughout her tenure at the Main Location, plaintiff and her husband were the only Hispanic program managers, although there were other Hispanic CIA officers and employees working there in other capacities.

Almost immediately upon her arrival at the Main Location, plaintiff experienced hostility from the Chief of Station ("COS"), the top CIA officer in the country and plaintiff's third-line supervisor. Specifically, the COS did not look at her when he spoke to her, did not greet her on the station floor, snubbed her at social events, and generally displayed more patience and acceptance of other officers than he did with plaintiff. Plaintiff's husband and another Hispanic officer, the Chief Liaison,[3]

---

1. "Lynn Peary" is not plaintiff's real name. Although no longer an active CIA officer, plaintiff has adopted a pseudonym for the purpose of this litigation to preserve CIA operational security.

2. The facts recited here are derived from the parties' pleadings and supporting documents

with all disputes of fact resolved in favor of plaintiff, the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

3. The Chief Liaison of a CIA station is the officer who oversees intelligence operations

also experienced "antagonistic" treatment from the COS. *See* Dep. of Chief Liaison at 72.

During her eighteen-month tenure at the Main Location, plaintiff frequently heard the COS refer to host-country liaison personnel as "goddamn gerbils," a remark plaintiff interpreted as an anti-Hispanic slur. *See* Dep. of Lynn Peary at 209–10. The COS also (i) failed to introduce plaintiff to a high-ranking official during a VIP visit, despite introducing all of the officers around her; (ii) declined to permit her to attend an out-of-country counter-narcotics conference, despite permitting two non-Hispanic officers to attend; (iii) did not support plaintiff's or her husband's request for an extended tour at the Main Location,[4] despite doing so for all of the other officers similarly applying; and (iv) interrupted plaintiff in the middle of a presentation, directing plaintiff to stop and the next presenting officer to begin. The last incident became well-known in the station because before he cut plaintiff off, the COS commented to the Chief of the Latin America Division—the COS's superior, who happened to be in attendance—that he could not understand "a damned word" that plaintiff, who speaks English with an accent, was saying. *See* Dep. of Chief Liaison at 72. The notoriety of the incident stemmed from the irony that the Division Chief was himself a stutterer. Although plaintiff did not hear the COS's "damned word" comment directly, she learned of it after the fact.

Plaintiff also experienced hostility from the station Finance Officer, with whom she had to interact frequently in the course of her program manager duties. Although generally rude to everyone, the Finance Officer was particularly rude to women, on one occasion telling plaintiff, "get the f____ out of my face," when she went to his office to submit a claim for travel reimbursement. The Finance Officer also used the word "spic" periodically in the station.[5] While plaintiff complained to the Chief Liaison about the Finance Officer's "get the f____ out of my face" comment, the record does not reflect that plaintiff ever heard the Finance Officer, or anyone else, use the word "spic."

Until shortly before the end of her tour in March 2001, plaintiff's principal task at the Main Location station was the management of a "liaison program," *i.e.*, an intelligence operation involving coordination and cooperation with foreign government officials. Her initial first-line supervisor in that capacity was the Chief of Programs. According to the Chief of Programs, plaintiff possessed weak writing skills and difficulty with English, but more than made up for the shortcomings with strong interpersonal skills, which he considered more essential to her role as an operations officer. Approximately ten months into her tour at the Main Location, for reasons undisclosed in the record, the Chief Liaison replaced the Chief of Programs as plaintiff's first-line supervisor. This supervisory change did not alter plaintiff's responsibilities, and

---

involving coordination and cooperation with foreign government officials.

4. The decision whether to grant an extended tour at a particular location is made at CIA Headquarters. A COS can support an officer's request for an extended tour by indicating his approval of the requested extension in the officer's request message to Headquarters. Here, the COS made no comments at all in plaintiff's or her husband's request message.

5. *See* Dep. of Chief Liaison at 84–85. Additionally, an unsworn statement by an unidentified person submitted in the CIA's administrative proceedings and proffered here by plaintiff avers that the Finance Officer described plaintiff "on several occasions" as "a stupid spic[ ], a thief, incompetent and worthless." *See* Pl.'s Mem. Opp. Summ. J., Ex. 11.

she continued to work on the liaison program.

In late 2000 or early 2001, over a year after plaintiff's arrival at the Main Location, the COS decided to start a new liaison program focused on "the Remote Location," a different city in the same Latin American country. As envisioned by the COS, the new program would involve regular travel to the Remote Location, but not a permanent move there; assigned personnel would continue to reside at the Main Location. *See* Dep. of COS at 80–81. In late January 2001, the Main Location station sent "cables," *i.e.,* secure messages, to CIA Headquarters requesting approval to initiate funding for the new program's operations, infrastructure, and equipment for the 2001 fiscal year. On February 13, 2001, the station received a response from Headquarters "fully endorsing" the new program and requesting that the station submit a proposed funding plan. The February 13 cable also stated that additional funding would be available, if warranted, to facilitate the station's plans for the new program. Thereafter, the COS had CIA contractors draft a cable requesting $250,000 in initial funding for the new program. It appears that this cable, or a similar funding request, was not sent until a month or more later.[6] Additionally, sometime during this period, plaintiff overheard the COS tell the Chief Liaison that he "was not going to ask headquarters for that much money," because the new program was "a decoy." *See* Dep. of Lynn Peary at 293. It is unclear from the record whether "that much money" referred to the $250,000 request or some other amount. In any event, plaintiff overheard the comment and remembered it.

In mid-February 2001, the COS, Deputy Chief of Station, and Chief Liaison met to discuss whom to assign as manager of the new program. The COS indicated that he wanted to assign plaintiff because she was non-productive and ineffective in her current program. The Chief Liaison, who considered plaintiff a very productive officer and did not consider the new program a "decoy," opposed the idea of assigning plaintiff to the new program because the Remote Location was then "a very dangerous area," and that under those circumstances, "we could have sent somebody else other than a female, not because they're less capable, but because of the situation down there … for security, et cetera." *See* Dep. of Chief Liaison at 68. Ultimately, however, the Chief Liaison failed to dissuade the COS from reassigning plaintiff. Thereafter, the Chief Liaison informed plaintiff that the COS intended to reassign her to the new program.

This news caused plaintiff and her husband great concern, as they feared that plaintiff's reassignment to what they thought was a "decoy" program in a dangerous location would jeopardize both plaintiff's career and her safety. In the eyes of plaintiff and her husband, the Remote Location was "extremely dangerous," "prone to guerilla attacks," and "far worse" than other places plaintiff had served, with "a kidnapping every three hours," as well as occasional bombings of hotels, churches, and restaurants. *See* Aff. of Lynn Peary's Husband at 1; Aff. of Lynn Peary at 1. In fact, plaintiff had previously traveled to the Remote Location for CIA business unrelated to the new program. On these occasions, plain-

---

**6.** Plaintiff notes in her brief that the cable requesting funding for the new program was not made part of the record in this litigation, and argues that a finding that no such cable was ever sent is warranted. *See* Pl.'s Mem. Opp. Summ. J. at 8 n. 5. Whether the cable

was sent is immaterial given that it is undisputed that the new program was funded as of May 2001. This fact also supports the inference that the cable or some similar communication was sent sometime prior to May.

tiff always had what she refers to as a "policeman" for protection, and was not permitted to stay overnight. Plaintiff was particularly apprehensive about the fact that the new program was still in the formative stages and without a verifiable funding stream, because it had "always been [her] experience that all equipment, including safety equipment and a secure telephone line, required funding approval from headquarters." *See* Decl. of Lynn Peary at 2. Without funds, plaintiff speculated, she "would not have had a policeman to protect [her]," or a means "to insure [the] loyalty" of a host-nation liaison, which, in her experience, was customary. *See* Aff. of Lynn Peary at 1; Decl. of Lynn Peary at 2.

Plaintiff's concerns about the lack of safety at the Remote Location were apparently not shared by all CIA officers at the Main Location, as other officers, including the COS, traveled to the Remote Location without bodyguards or other precautions beyond those they observed elsewhere in the country, the entirety of which was considered by the CIA to be "a high threat environment" during the period in issue. *See* Dep. of COS at 8, 11–12, 24–25; Decl. of Marilyn Dorn[7] at 3. Consistent with this, all CIA officers assigned to the country were required to attend a one-week personal security course, which plaintiff attended in July 1999. Plaintiff also attended a two-week firearms certifications course that same month, but nonetheless chose not carry her assigned weapon in country because, as she put it, "if I ever had to use it, then it's more trouble ... to explain [the use] ...." *See* Dep. of Lynn Peary at 85.

After learning that plaintiff would be reassigned to the new program, plaintiff's husband approached the COS and request-

ed that he be assigned to the new program in lieu of plaintiff. When the COS denied this request, plaintiff met with the COS. During this meeting, which occurred on March 2, 2001, plaintiff expressed her concern that neither a program manager slot nor funding had yet been approved for the new program, and she requested that her reassignment be put in writing. According to plaintiff, the COS then became upset, pounded on his desk, reminded plaintiff that she had no right to remain in her current program, and told her that he did not need to inform Headquarters about his decision to assign her to manage the new program that Headquarters had already approved. Believing that she had no choice in the matter, plaintiff told the COS that she would accept the assignment to the new program. The COS then told plaintiff that "S," a recently-arrived white male officer younger than forty years old, would be plaintiff's deputy in her current program "until he learned his way around," at which time S would assume full responsibility for plaintiff's current program. *See* Dep. of Lynn Peary at 108.

Following the meeting, plaintiff did not immediately begin working on the new program but instead went "TDY," *i.e.*, on a temporary assignment, to another location. Upon her return, the Chief Liaison informed her that her reassignment would be effective immediately, and accordingly she took steps to establish the new program. Over the next two days, plaintiff organized a list of personnel for the program and attempted to make travel arrangements and to procure equipment. Because funding for the new program had not yet been provided, however, plaintiff was unable to arrange for travel and equipment, and thus, as she observed, she

---

7. Marilyn Dorn is the Chief of the Information Authorities Group and the Information Review Officer for the CIA's Directorate of Operations. Her function in this and other lawsuits is to represent the CIA's knowledge of certain facts or events.

"had practically nothing to do" during that two-day period. *Id.* at 119. Rather than seek a second meeting with the COS to discuss the lack of funds for the new program, plaintiff instead met with "E," a Headquarters employee who was TDY to the Main Location, on March 14, 2001. E's position and duties at the CIA are not disclosed in the record beyond plaintiff's testimony that he "oversee[s] all the operations." [8] Plaintiff asked E about the procedure to obtain funds for a new program, and was told that "the station needed to send a proposal, and then headquarters would receive the proposal and write an amendment for Congress to include the funding for that program . . . ." *Id.* at 224–25. E also told plaintiff that the new program had not been included in the station's request for funding. At the time, plaintiff was checking the station's cable traffic "every day" to see whether the cable requesting funding for her program—which had been drafted more than a month before—had been sent. *Id.* at 230. Deeply anxious over the new program's lack of funds and the security situation in the Remote Location, and with the word "decoy," in her words, "banging in [her] head," plaintiff became distraught about her career as a program manager. *Id.* at 289. On March 15, 2001, the day following her meeting with E and two days after beginning work on the new program, plaintiff attempted suicide. Two days later, she was medically evacuated from the Main Location.

The day prior to plaintiff's attempted suicide—the same day she met with E—the station sent a cable to CIA Headquarters stating that "[the] station is proceeding full speed ahead with plans to establish" the new program, and that "program manager Lynn Peary will travel to [the Remote Location]," and "immediately commence the process . . . ." Approximately seven weeks later, on May 2, 2001, the station received a cable establishing a source of funds for the new program. At that time, the new program was being run by the station liaison program manager [9] on an interim basis.

Several months later, "D," a Hispanic man over forty years old, arrived at the Main Location as plaintiff's permanent replacement. Under D's leadership, the new program has been an intelligence-gathering success. For his work on the program, D has received two cash bonuses, a promotion, and a military award from the host nation. As with other liaison programs in the same country, and as would have been true for plaintiff, D's security at the Remote Location is provided by host-country liaison personnel who accompany him to and from the local airport. As would also have been true for plaintiff, D's work at the Remote Location is typically performed at a military base. Plaintiff's husband has also performed some work on the new program, and it appears from the record that similar security arrangements were made for him on his trips to the Remote Location: he was always accompanied by what he refers to as a "security officer," and did not travel to the airport by taxi. *See* Aff. of Lynn Peary's Husband at 1. The success of the new program and plaintiff's contributions to it are reflected in plaintiff's post-departure performance appraisal, which states:

> [B]ecause of her people skills and previous program experience, [plaintiff] was asked to assume responsibility for all the details related to the creation of a

---

8. *See* Dep. of Lynn Peary at 132. At deposition, plaintiff admitted that E "was just somebody that [she] asked [about funding] outside of [her] chain of command." *Id.* at 228.

9. It is unclear from the record whether this individual and the Chief Liaison are the same person.

new ... unit to operate [at the Remote Location]. She worked closely with [liaison personnel] to identify candidates for the unit .... The unit now exists, is working and producing results. She made it all possible.

*See* Decl. of Marilyn Dorn at 5 n. 2.

Plaintiff retired from the CIA at the conclusion of her convalescence from her attempted suicide. In October 2003, plaintiff filed the present action in the federal district court for the District of Columbia, alleging (i) that the COS subjected her to disparate treatment on the basis of race, sex, and age when he reassigned her to the new program, and (ii) that the COS and the Finance Officer subjected her to a racially and sexually hostile work environment. In August 2004, the case was transferred to this district pursuant to 28 U.S.C. § 1406(a). *Peary v. Tenet,* Civil Action No. 03–2212 (D.D.C. May 12, 2004) (Order). Thereafter, defendant filed the present motion for summary judgment. Following oral argument on the motion, additional discovery was ordered on the subjects of (i) the gender and ethnicity of D; (ii) D's security arrangements at the Remote Location; and (iii) the effect of managing the new program on D's career prospects. The summary judgment issues have now been fully briefed and argued and the motion is therefore ripe for disposition.

## II.

A party's motion for summary judgment should be granted if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether to grant a party's motion, a court must assess the evidence offered by both parties and "determine whether there is a genuine issue for trial" after viewing the evidence in the light most favorable to the non-moving party and resolving all factual disputes in that

party's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The facts set forth, moreover, must be more than a mere scintilla of evidence; rather, the evidence offered must be sufficient for a reasonable factfinder to find in the non-moving party's favor. *See id.* at 2548–51.

## III.

### A. Disparate Treatment Claims

A plaintiff's initial burden at the summary judgment stage in a disparate treatment case under Title VII or the ADEA is to establish a *prima facie* case of prohibited discrimination in employment. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII); *O'Connor v. Consolidated Coin Caterers,* 517 U.S. 308, 310–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (ADEA). This can be done either through direct evidence of discrimination or through the inferential proof scheme set forth *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817, and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 959 (4th Cir.1996). Here, plaintiff has chosen to rely on the inferential proof scheme of *McDonnell Douglas—Burdine. See* Pl.'s Mem. Opp. Summ. J. at 17.

Under the *McDonnell Douglas—Burdine* proof scheme, a plaintiff can establish a *prima facie* case of disparate treatment and thereby carry her initial burden on summary judgment by producing credible

evidence (1) that she is a member of a protected class; (2) that her job performance was satisfactory; (3) that she was subjected to an adverse employment action by her employer; and (4) that similarly situated employees outside her protected class received more favorable treatment. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (assuming *McDonnell Douglas* framework applies to ADEA claims); *Richardson v. Richland County Sch. Dist. No. One*, 52 Fed.Appx. 615, 616 (4th Cir.2002) (applying *McDonnell Douglas* to both Title VII and ADEA claims). For purposes of the instant motion, defendant concedes that plaintiff has satisfied the first and second prongs of the *McDonnell Douglas prima facie* case. In dispute, however, are the third and fourth prongs. Defendant contends that plaintiff has failed to proffer evidence that she suffered an adverse employment action, or that similarly situated employees outside of her protected classes received more favorable treatment than she did. Because the record plainly reflects that plaintiff was not subjected to an adverse employment action, it is unnecessary to reach the dispute over the fourth prong of *McDonnell Douglas—Burdine.*

 The requirement of an adverse employment action in Title VII and ADEA disparate treatment cases is derived from the prohibition in each statute against dis-criminating on an impermissible basis with respect to employees' "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a); 29 U.S.C. § 623(a); *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).[10] Courts interpreting this language hold that a discriminatory act must adversely affect "the terms, conditions, or benefits" of the plaintiff's employment to be actionable under either statute. *Richardson*, 52 Fed.Appx. at 616; *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001).[11] While a plaintiff can meet this standard without showing that he was subjected to an "ultimate employment decision," *i.e.*, a firing, layoff, or failure to promote, it is also true that not every aspect of an employee's daily work experience constitutes a "term[ ], condition[ ], or benefit[ ]" of employment that can give rise to a federal cause of action if changed or withdrawn. *Von Gunten*, 243 F.3d at 865. Thus, mere reassignment to a less appealing job does not constitute an adverse employment action. *Id.* at 868. Instead, "reassignment can only form the basis of a valid Title VII [or ADEA] claim if the plaintiff can show that the reassignment had some significant detrimental effect." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir.1999). More specifically, it is clear that "[a]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an

---

**10.** Worth noting here is that proof of an adverse employment action is required whether plaintiff proceeds under the inferential proof scheme of *McDonnell Douglas—Burdine* or on the basis of direct evidence of discriminatory animus. *See James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.2004).

**11.** Although *Von Gunten* was a Title VII retaliation case rather than, as here, a discrimination case, it is well-settled in the Fourth Circuit and elsewhere that the same adverse-action standard applies to both types of claims. *See James*, 368 F.3d at 375 n. 2; *Von Gunten*, 243 F.3d at 863 n. 1; *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300–1301 (3d Cir.1997) ("we hold that the 'adverse employment action' element of a retaliation plaintiff's prima facie case incorporates the . . . requirement that the retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e–2(a)(1) or (2) [Title VII's anti-discrimination provisions]").

adverse employment action even if the new job does cause some modest stress not present in the old position." *Id.* at 256–57. Were this not so, "every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996).

■ A reassignment "to a new position commensurate with [plaintiff's] salary level" is precisely what occurred here. *Boone,* 178 F.3d at 257. The gravamen of plaintiff's complaint is that she was reassigned from one intelligence-gathering operation to another in the same foreign country. It is undisputed that each program was a liaison program, and that plaintiff's rank, salary, and benefits remained constant before and after the reassignment. Plaintiff, however, contends that her reassignment was nonetheless an adverse employment action because the new program (i) was a sham program unlikely to lead to career advancement, and (ii) involved a significant increase in danger. Each of these arguments merits close inspection.

■ With respect to plaintiff's first argument, it is well-settled that opportunity for promotion is a "term[ ], condition[ ], or benefit" of employment the denial of which can amount to an adverse employment action. *See James,* 368 F.3d at 376; *Boone,* 178 F.3d at 256. Here, however, the record is devoid of evidence that plaintiff's reassignment to the new program brought with it any diminution in opportunity for career advancement. To the contrary, the record manifestly reflects that D, the officer assigned the new program in plaintiff's stead, received a promotion, a foreign award, and two cash bonuses for his work on the program. There is no basis on which a reasonable jury could conclude that plaintiff could not have obtained the same benefits had she chosen to continue working on the new program. Indeed, her post-departure performance appraisal reflects that the ultimate success of the new program is attributable in some measure to plaintiff's efforts in identifying candidates for the program unit. That the COS referred to the program as a "decoy"— whatever that may have meant—and notwithstanding his skepticism about the program's prospects, the new program in fact ultimately proved to be career-enhancing, as D's experience as its manager demonstrates. Nor is the fact that the new program did not have a dedicated source of funds until seven weeks after plaintiff was assigned proof that the program was a dead-end assignment. Plaintiff's performance appraisal reflects that her brief work on the new program while it was still unfunded was recognized, and nothing in the record suggests that the funding of the new program would have been decreased in amount or additionally delayed had plaintiff continued to work on it. Accordingly, the record does not provide a basis for a reasonable jury to conclude that the new program was less than a bona-fide intelligence operation, or that plaintiff's career opportunities diminished as a result of her assignment to it.

■ With respect to plaintiff's second argument, authority in the Fourth Circuit and elsewhere suggests that exposure to harm is also a "term[ ], condition[ ], or benefit" of employment relevant to the adverse-action analysis. *See Von Gunten,* 243 F.3d at 868; *Schmidt v. Montgomery Kone, Inc.,* 69 F.Supp.2d 706, 714 (E.D.Penn.1999). In *Von Gunten,* a former employee of the Maryland Department of the Environment brought a Title VII retaliation claim [12] against the State of

---

12. The fact that *Von Gunten* involved claims of retaliation rather than discrimination is irrelevant to the adverse-action analysis. *See supra* note 11.

Maryland based in part on her reassignment from water-sampling duty in the Chesapeake Bay to work conducting sanitary surveys of coastal residences. *Id.* at 861–63. At summary judgment, Von Gunten contended that the reassignment was an adverse employment action because the sanitary survey work "exposed her to dangerous pathogens" that the Bay duty did not. *Id.* at 868. Although the Fourth Circuit concluded that the plaintiff had "failed to proffer any credible evidence that her exposure to these chemicals did in fact increase in the new assignment," and thus affirmed the grant of summary judgment for the employer, the court "agree[d] in principle that increased exposure to dangerous pathogens could adversely effect the terms, condition[s], or benefits of employment . . . ." *Id.* Similarly, in *Schmidt*, the district court held that the plaintiff's reassignment to outdoor construction jobs could constitute an adverse employment action because his reassigned work involved "significantly more difficult, physically demanding, and dangerous jobs" than he had previously received, and because "he was not furnished with the proper equipment needed to safely and effectively complete [such] jobs . . . ."[13] In sum, some courts sensibly recognize that a reassignment exposing an employee to greater risk of harm may amount to an adverse employment action even when no adverse

effect on compensation, job title, level of responsibility, or opportunity for promotion is involved.

■ Yet, it is important to recognize that this principle does not apply with equal force in all employment contexts. While every form of employment carries some risk, certain occupations—*e.g.,* fireman, policeman, CIA operations officer—carry a degree and type of risk quite unlike that found in the more commonplace work environments of *Von Gunten* and *Schmidt.* Typically, as is the case here, persons who train and volunteer for such positions are well aware of both (i) in the inherent risks of such occupations, and (ii) the fact that they will be subject to reassignments with greater and lesser degrees of risk throughout their careers. *See Jones v. District of Columbia,* 346 F.Supp.2d 25, 53 (D.D.C.2004) (noting that plaintiff "knew when she accepted her position as a corrections officer that she would be subject to . . . rotation into tower duty."). Thus, in certain contexts, reassignment to a position carrying a greater degree of a risk that the employee has already agreed to tolerate—and, importantly, has been trained to tolerate—is merely a foreseeable stage in the progression of the employee's career, not an adverse employment action.[14] Courts recognize this point, holding in the law en-

---

13. *See Schmidt,* 69 F.Supp.2d at 714. As in *Von Gunten,* the adverse-action analysis in *Schmidt* concerned claims of retaliation rather than discrimination. Unlike *Von Gunten,* however, *Schmidt* was brought under the ADEA rather than Title VII. While the Fourth Circuit has not expressly stated that discrimination and retaliation claims under the ADEA are subject to the same adverse-action standard—as it has for discrimination and retaliation claims under Title VII, *see supra* note 11—its general preference for parallel interpretation of Title VII and the ADEA suggests that *Schmidt* is instructive here. *See Richardson,* 52 Fed.Appx. at 616.

14. Both *Von Gunten* and *Schmidt* are distinguishable from the instant case on this point, as the record in *Von Gunten* does not reflect that the plaintiff was aware at the outset that sanitary survey duty might expose her to dangerous pathogens, *see Von Gunten,* 243 F.3d at 862–63, nor does the record in *Schmidt* reflect that the plaintiff there knew that he would not be provided with the necessary safety equipment to complete his duties, *see Schmidt,* 69 F.Supp.2d at 709–10. Additionally, neither case mentions whether the employee plaintiffs received any training to minimize the risks to which they would be exposed.

forcement context that a transfer from administrative duty to beat duty does not constitute an adverse employment action. *O'Neal v. City of Chicago,* 392 F.3d 909, 912–13 (7th Cir.2004); *see also Jones,* 346 F.Supp.2d at 53 (reassignment of corrections officer to "tower duty" not a "tangible employment action"). While it does not appear that the officer plaintiffs in *O'Neal* or *Jones* raised the specific argument that their reassigned duties were more dangerous than their previous ones, this may be so because it was too obviously a losing argument.

The same result should obtain here. Plaintiff's employment, for which she volunteered and was trained, consisted of managing covert intelligence-gathering operations in a foreign country considered by the CIA to be a "high threat environment." In this context, reassignment to a program involving travel to—but not residence in—a comparatively dangerous location in the same foreign country was clearly within the range of foreseeable risks when plaintiff first accepted her posting to the Main Location. Under such circumstances, plaintiff's reassignment to the new program does not violate Title VII; to hold otherwise would effectively inject federal courts into the CIA mission-assignment process, and potentially make all assignments of CIA operations officers subject to re-examination in federal court, a result plainly not intended by Congress.

Here, the relevant question for Title VII purposes is not whether work on the new program was more dangerous than work on plaintiff's old program, but rather whether plaintiff would have received the same security arrangements at the Remote Location as any other CIA officer traveling there on official business. On that point, the record is devoid of evidence that plaintiff would have been afforded any less security than the security afforded to D or her husband on their trips to the

Remote Location for their work on the new program. Their security arrangements, in fact, closely resemble those that plaintiff received when she traveled to the Remote Location in her previous assignments. Plaintiff's argument that she would not have had proper security at the Remote Location because the new program was not funded at the time of her reassignment is belied by the fact that she was never required to travel to the Remote Location without security or before the new program was funded. Indeed, the record reflects that plaintiff was unable to travel to the Remote Location before the new program was funded. Further, there is no evidence that the COS or anyone else ever ordered plaintiff to go to the Remote Location at any particular time, without adequate security. Thus, there is no basis on which a reasonable jury could conclude that plaintiff would have been subjected to greater hazards at the Remote Location than D, her husband, or any other CIA officer working there.

Nevertheless, even assuming that a transfer to a riskier assignment constitutes an adverse employment action in the covert-operative context, the record does not reflect that plaintiff's assignment to the new program brought with it a significant increase in danger. As previously noted, it is clear from the record that plaintiff's reassignment to the new program did not require plaintiff to move to and reside at the Remote Location. The record suggests that had she stayed, plaintiff would have continued to reside at the Main Location while making regular trips to the Remote Location, just as D, her successor, has done in managing the new program. It is also clear that plaintiff was required to travel to the Remote Location even in her previous assignments, although the record does not reflect how frequently such trips occurred. Thus, even accepting at face value plaintiff's conclusory asser-

tions regarding the danger associated with the Remote Location, the record reflects only that plaintiff would have been required to travel to the Remote Location more often than in her previous assignments.

Additionally, again accepting at face value plaintiff's conclusory assertions regarding the Remote Location, the fact that the Remote Location was "very dangerous," "extremely dangerous," or "far worse" than other locations does not establish that plaintiff's duties there would have been significantly more dangerous than her duties in her old program. The record reflects that D, plaintiff's successor in the new program, is accompanied by host-nation liaison personnel to and from the airport whenever he travels to the Remote Location, and that his work there typically occurs on a military base, not in a high-risk zone. The same would have been true for plaintiff. The record further reflects that such an arrangement is the norm when CIA officers travel throughout the country in question, and that plaintiff's and her husband's experiences on trips to the Remote Location were not substantially different. As previous noted, the record does not reflect that the new program's initial lack of funding would have adversely impacted plaintiff's safety, as she was unable to travel to the Remote Location until funding was provided. There is, accordingly, no basis on which a reasonable jury could conclude that plaintiff's work in the new program would have involved significantly greater danger than her work in her old program.

As a final point on the adverse-action analysis, worth noting here is that plaintiff and her husband do not appear to have considered the Remote Location too dangerous for anyone to visit; indeed, plaintiff's husband requested to be assigned to the new program, and he eventually traveled to the Remote Location while working on it. Instead, it appears that plaintiff and others considered the Remote Location too dangerous for plaintiff to visit, with the Chief Liaison expressly stating that he felt that way because of plaintiff's gender. It appears that the course of action favored by plaintiff, her husband, and the Chief Liaison was not augmenting the security precautions at the Remote Location, but rather shielding plaintiff from a risky assignment on the basis of her gender. The fact that the COS declined to follow this course of action might, under different circumstances, have avoided a Title VII action rather than given rise to one.

For the foregoing reasons, plaintiff did not suffer an adverse employment action when she was reassigned to the new program, and summary judgment on plaintiff's claims of disparate treatment is appropriate. While it is thus unnecessary to reach the fourth prong of the *McDonnell Douglas—Burdine prima facie* case, *i.e.,* whether a similarly-situated employee received more favorable treatment than plaintiff, it is worth noting that S, the young white man who assumed plaintiff's position as manager of her old program, is not a relevant comparator for purposes of this case. As previously stated, the proper Title VII question in these circumstances is not whether plaintiff's new assignment was more dangerous than her previous one, but rather whether the she was afforded—or would have been afforded, had she chosen to go—the same security precautions in the Remote Location as other officers sent there for CIA business. On this point, the record does not reflect that plaintiff has identified any similarly-situated employee who received more favorable treatment than she did.

### B. Hostile Work Environment Claims

 To defeat a motion for summary judgment on a hostile work environment claim under Title VII, a plaintiff

must put forth sufficient facts to establish (1) unwelcome conduct; (2) that is based on plaintiff's membership in a protected class; (3) that is sufficiently severe and pervasive to alter the conditions of employment; and (4) some basis for imputing liability upon the plaintiff's employer. *See Smith v. First Union Nat'l Bank,* 202 F.3d 234, 243 (4th Cir.2000); *Conner v. Schrader–Bridgeport International, Inc.,* 227 F.3d 179, 192 (4th Cir.2000). The third prong, severity and pervasiveness, has both objective and subjective components. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Here, defendant concedes for purposes of the present motion that plaintiff found the conduct of the COS and the Finance Officer unwelcome and hostile. Thus, the first prong of the hostile work environment *prima facie* case is satisfied, as is the subjective component of the third prong. Defendant claims, however, that the conduct plaintiff complains of (i) was neither ethnicity-based nor sex-based, and (ii) was not sufficiently objectively severe and pervasive to be actionable under Title VII. Because it is clear that the hostility of plaintiff's work environment was not objectively severe and pervasive, defendant's former argument is not reached.

 The objective component of the "severe and pervasive" prong of a Title VII hostile work environment claim is governed by the principles set forth in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and its progeny. Under those principles, a court considering whether a work environment is objectively hostile must assess "all of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance." *Anderson v. G.D.C. Inc.,* 281 F.3d 452, 459 (4th Cir.2002). Although the question

whether a work environment is objectively hostile is "quintessentially a question of fact," *Paroline v. Unisys Corp.,* 879 F.2d 100, 105 (4th Cir.1989), it is well-settled that proof of hostile work environment claims can be so deficient as to warrant judgment as a matter of law. *See, e.g., Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 773–74 (4th Cir.1997).

 Applied here, the considerations set forth in *Harris* and *Anderson* point persuasively to the conclusion that the hostility plaintiff experienced at the Main Location was not sufficiently severe and pervasive to be actionable under Title VII. First, the record reflects that to the extent plaintiff's work environment was regularly hostile, the hostility was mild. The episodes of daily hostility of which plaintiff complains include such slights as the COS's failing to greet her or lift his head from papers when he spoke to her, and his repeated description of host-country liaison personnel as "goddamn gerbils." Although such conduct is unprofessional, it is hardly severe; indeed, "goddamn gerbils" is a far milder epithet than those typically found actionable in hostile work environment cases. *See, e.g., Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 182 (4th Cir.2001) ("nigger," "dumb monkey," and "black bitch"). The fact that plaintiff may have perceived that phrase as an ethnic slur does not make it actionably severe under the objective standard that the law imposes. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (" '[The] mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' [does] not affect the conditions of employment to [such a] sufficiently significant degree [as] to violate Title VII.") (quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971)). Additionally, the record is devoid of any description of daily hostility from the Finance Officer beyond general rudeness, which, as plaintiff admitted at

deposition, was often directed at everyone.[15] The only specific vulgarity regularly attributed to him, *i.e.*, "spic," though objectionable in the extreme, did not contribute to the hostility of plaintiff's daily work environment because she did not hear him, or anyone else, use that word. *See Shields v. Fed. Express Corp.*, 120 Fed.Appx. 956, 961 (4th Cir.2005) (holding no hostile work environment created by slur uttered outside of plaintiff's presence).

The daily hostility that plaintiff experienced, of course, may not be considered separately from the episodic hostility that accompanied it. *See Conner*, 227 F.3d at 193–94. In that regard, the record reflects that the COS (i) did not permit plaintiff to attend a counter-narcotics conference, (ii) failed to introduce her to a visiting VIP, (iii) did not help her or her husband extend their tours at the Main Location, and (iv) interrupted a presentation she was giving after commenting that he could not understand "a damned word" that she was saying. Of these instances, only the last arguably reflects an intent to embarrass or humiliate plaintiff, and it appears from the record that it backfired; contrary to plaintiff's characterization of the event, the COS appears to have made himself the butt of office jokes by commenting to a stutterer, who happened to be his boss, that he could not understand plaintiff's speech. There is, of course, the episode of the Finance Officer's telling plaintiff, "get the f___ out of my face." This single instance, however, did not alter the overall conditions of plaintiff's work environment in the manner that Title VII requires. *See Shields*, 120 Fed.Appx. at 961 ("As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir.2004))).

Importantly, the record is devoid of evidence of any physical threatening or touching. Although plaintiff cites her reassignment to the new program and the dangerousness of the Remote Location as a evidence of a physical threat relevant to the objective-hostility analysis, the record does not reflect, as noted earlier, that plaintiff was ever ordered to go the Remote Location with inadequate security. Finally, it does not appear that plaintiff's work performance suffered as a result of the hostility she experienced at the Main Location; her final performance appraisal reflects a strong performance.

For the foregoing reasons, the hostility of plaintiff's work environment at the Main Location was not objectively severe and pervasive. Thus, summary judgment on plaintiff's hostile work environment claim is appropriate.

## IV.

An appropriate Order has issued.

---

**15.** Indiscriminate vulgarity and rudeness is not relevant to a Title VII hostile work environment claim. *See EEOC v. R & R Ventures*, 244 F.3d 334, 337–38 (4th Cir.2001).